Filed 12/18/24

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
|     Plaintiff and Respondent, | E081367 |
| v. | (Super.Ct.No. INF2101817) |
| ELOY JAIME TORRES, SR., | OPINION |
|     Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. F. Paul Dickerson III, Judge. Affirmed.

Arielle Bases, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, A. Natasha Cortina and Elizabeth M. Renner, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted appellant of three counts of forcible rape and three counts of incest (among other offenses) against his biological daughter, who was 16 and 17 years old at the time. He argues the incest charges should be reversed because the prosecution

did not present genetic testing evidence or evidence he was married to and cohabiting with the victim's mother when the victim was conceived. He argues such evidence is necessary to establish he was the victim's biological father, making both the jury instructions and the evidence insufficient. We reject his arguments because these kinds of evidence, while potentially *sufficient* to establish biological parenthood, are not *necessary* to do so, and the prosecution presented other kinds of evidence sufficient to establish appellant was the victim's biological father.

Appellant also appeals the sufficiency of the evidence he committed forcible rape rather than statutory rape. He argues the prosecution did not establish the victim's lack of consent or that he accomplished sexual intercourse by force or duress. We conclude there was ample evidence the teenage victim did not consent to any of the three incidents of sexual intercourse. We affirm the conviction on the first incident because there was sufficient evidence to establish appellant used force to accomplish the act. We affirm the convictions on the two subsequent incidents because the evidence of the appellant's elaborate grooming scheme, which included providing addictive narcotics, isolating the victim, and threatening her with the loss of a desired parent/child relationship, was sufficient to establish a direct or implied threat that would coerce a reasonable teenager of ordinary susceptibilities to submit to sexual intercourse.

We also reject appellant's argument that his sentence of 22 years 8 months followed by a life sentence without possibility of parole is cruel and unusual. We therefore affirm the judgment.

2

# I

## FACTS

Defendant and appellant, Eloy Jaime Torres, Sr., was tried for various crimes related to several incidents of sexual activity with his teenage daughter, Jane Doe, which resulted in her pregnancy and an abortion.[1]

Torres's parents, Aurora and Arturo, adopted Doe when she was three months old because they believed Torres and Doe's biological mother were not responsible enough to raise a baby. Torres and Doe's biological mother had lost other children in dependency.

After the adoption, Torres and Doe's biological mother moved to Oklahoma, where they lived for over a decade and had other children. During that period, Doe had little contact with Torres or her biological mother. Eventually they returned to California, where they lived at Aurora and Arturo's house for about two years before moving into an apartment.

When Doe was about 14 or 15 years old, Torres and Doe's biological mother divorced, and Torres moved in with his parents and Doe at their home in Indio. Torres initially slept in the living room, but later moved to the back yard. At first, Doe did not want any sort of relationship with Torres.

During her sophomore year of high school, Doe was suspended for drug possession. Aurora told Torres about Doe's problem and urged him to speak to her.

---

[1] The trial court granted a motion to keep Jane Doe's identity confidential.

Torres took the opportunity, but not in the manner Aurora intended. He asked Doe about the suspension and asked if she smoked marijuana. Doe said she did, and Torres offered her a pipe. Doe thought the pipe looked strange but smoked it with Torres. She later discovered the pipe contained methamphetamine, not marijuana.

Over the next several months, Torres and Doe spent time together, watching movies, listening to music, and taking bike rides. Torres encouraged Doe to visit him in the evenings, while her grandparents (and adoptive parents) were asleep. After moving to the back yard, Torres slept in a sleeping bag on a massage bed. Later, he moved into a tent.

While using the massage bed, Torres told Doe she should lay close to him so Aurora and Arturo would think he was alone if they looked into the yard. Eventually, he convinced Doe to climb inside his sleeping bag with him. At first, they would lie together as Torres smoked his pipe and blew methamphetamine smoke into Doe's mouth from about an inch away, a practice called "shotgunning." Eventually, Torres convinced Doe to lie in the sleeping bag facing him in a hugging position. Doe said she felt uncomfortable because she was so physically close to Torres and didn't like hugging him. Several times she refused, and appellant would get frustrated and withdraw, or as Doe described it, "throw a little silent fit." Once, Torres put his hand on Doe's buttocks. Doe said it felt "weird" and uncomfortable and that she did not know how to react.

Early on, Doe told Torres she liked girls and was not interested in men. She told him, "I'm lesbian" and mentioned she had a girlfriend, although she confided she had not

4

yet had a sexual relationship with anyone. Torres urged Doe to "giv[e] being straight a chance," told her she may want children, and tried to convince her to wear more feminine clothing. Doe insisted her sexual orientation was fixed and told Torres "I don't like [men's] penises," and insisted "I hate how they look. They look like aliens. They just disgust[] me. I wouldn't want to have that inside me." Doe testified she twice told Torres she would never want a penis inside her. He told her she didn't know what she wanted.

Despite these protests, Torres continued introducing sexual topics and touching into their relationship. He would joke with Doe about sex and show her pornography of "mature women" on his tablet or his phone. Doe approximated that five out of seven nights a week they would get into the sleeping bag at around 11:00 p.m., smoke drugs, and Torres would touch her buttocks. This pattern continued for about five to six weeks.

Eventually, Torres began trying to touch her vaginal area too. Doe said, "I felt disgusted because it was my dad. I didn't want it, and it didn't feel right." Torres would ask Doe if he could touch her, and she would respond, "No, I don't want to do it." He would then ask why not and keep "begging and begging." Sometimes he would pressure her to let him touch her "just real quick." Doe said she felt annoyance and pressure and would eventually relent, and Torres would "do what he wanted to do" while she laid there. This went on for about three weeks. Doe said she did not know who to talk to, and questioned whether her friends would help her if she told them. Torres told Doe that if anyone found out, he would be killed in jail. The thought of something bad happening to her father scared her.

It was at this point that Torres moved from the massage bed into a tent he erected in the back yard. Doe began tying her bottom clothing tight to prevent Torres from touching her buttocks. Torres would ask, "Why is this so tight?" and loosen the clothing. Doe said she responded, "Why do you think it's tight? It's because I don't want you in my pants." Torres responded, "You don't know. You don't know what you want. You haven't done anything with anybody." Torres started asking Doe to dress in skirts or dresses, rather than her usual baggy sweats. He would give her skirts, dresses, and thong underwear and tell her to put them on. He also suggested she might feel more feminine if she painted her fingernails. She declined, but let him paint her toenails because she wore closed toed shoes and the nail polish would not show.

When Torres painted her toenails, he would have Doe lie back and he would open her legs with his hand. The first time he did this, she felt uncomfortable and closed them. Torres asked her to leave her legs open, saying "I want to see" as he looked at her vaginal area. This time, and other times, she was wearing a skirt and thong underwear at Torres's request. She tried closing her legs at least twice but appellant kept pushing them open. This happened several times, including at least twice when Doe was not wearing underwear. Doe felt like she had no choice because Torres would get frustrated and ask her to leave her legs open, and then "kind of beg" until she complied.

Eventually, Torres wanted to have sex with Doe, who was then 16 years old. Torres told Doe he was frustrated with his partner, saying she would not satisfy him sexually and would just "lay there." The first time the two had sexual intercourse, they

were engaged in the toenail painting ritual, Doe was wearing a skirt and thong, and Torres had given Doe methamphetamine. Torres asked Doe for sex and she refused. He pressured her, told her no one would know, and she tried to put him off by saying she did not want to get pregnant and penises look disgusting. He told her she did not know what she wanted and reassured her "once you feel it, it will feel good." He kept asking, commented that he was sexually frustrated, then watched a movie for a while, before trying to touch her vagina again and asking "Can I do it?" Doe said, "No, no."

Torres became frustrated for a while but then kept pressuring Doe until she said, "Okay. Fine, go ahead," and, "Just do what you have to do." She told him he would have to wear a condom because she did not want to get pregnant. On cross-examination, she testified that the first incident proceeded in two stages. First Torres asked to put his penis on her clitoris, and then he escalated by asking to put his penis inside her vagina. Doe said she let him proceed because she knew he would not stop asking and if he did not get his way he would withdraw. She said she was not afraid he would get angry, but said she wanted to avoid his sulking. She also explained allowing sexual contact was the only way to get him to give her attention.

Torres put on a condom, moved Doe's thong to the side and placed his penis "on top of" her vagina and a few minutes later penetrated her vagina with his penis as she lay on her back on the padding he used as a bed. Doe said she was tense, felt pain, and wanted to cry when he penetrated her. She described the pain as feeling as if "something was ripping" and said she reacted by exclaiming and scrunching her face. Torres became

7

frustrated because Doe was so tense and told her to relax. She responded, "How can I not be tense? It hurts. And I don't want it." Torres responded, " You're tensing up. You're just thinking too much about it. You'll be fine." For a while, Doe tried to get Torres off her, pushing on his thighs with her hands. She said Torres adjusted, "put more force into it," and continued. She said she was too weak to push Torres off, and she eventually stopped trying. Doe said Torres then "continued until he finished." Afterward, she changed her clothes and left because she did not like how she felt. When they saw each other next, they acted like it had not happened.

The second time they had sexual intercourse, Doe testified she was under the influence of marijuana as well as methamphetamine Torres had supplied. They re-enacted the toenail painting ritual while Doe wore the feminine clothing Torres requested and provided. Torres put his hand on her thighs and moved her legs open, and Doe tried to close them. Torres opened her legs again, and when she tried to close them again, he questioned why and grew silent. Doe re-enacted his response by turning her head, sighing, and shrugging her shoulders. She said his reaction "made [her] feel upset because [she] didn't want him to feel that way." After his "silent fit," Torres again requested sex. Doe said she did not want to have sex because the last time hurt, and she was worried about becoming pregnant. Torres told Doe intercourse would feel better the more often they did it. Doe eventually said "okay, fine" but insisted Torres had to wear a condom.

Doe said she was worried Torres would grow angry if she refused. She said she was afraid when Torres would yell at her, which he did when he was trying to discipline her as a father. She said he would get aggressive and those incidents sometimes played a factor in her decision to allow sexual touching or intercourse. She recalled an incident, after the first time they had intercourse, when he got mad at her for sneaking out with her friends. When she returned, she appeared to ignore Torres and her adoptive parents while they were lecturing her. Torres got upset, grabbed her phone and slammed it on a table, breaking it in half. He then threw the phone into the pool. She denied his anger was a concern during the first incident of sexual intercourse, but said it was a concern "the second and third time."[2] She explained that she did not know appellant well and did not know if he would "completely lose it" if she refused him.

Torres put on a condom and vaginally penetrated Doe from behind while she was on her knees and forearms on the padding he used as a bed. Doe said Torres put her in that position. During the sex, Doe looked down and saw the condom had come off. She immediately pushed herself away. Torres claimed the condom had slipped off, put it back on, and asked if they could continue. Doe objected because she felt wet and said she thought he had secreted pre-ejaculate. Torres tried to persuade Doe it would be all right and the wetness was her own lubricant, but Doe said she knew she was not aroused. Doe gave conflicting testimony about whether they continued having intercourse that time. At

---

[2] Doe also testified about a near confrontation between Torres and one of her male friends involving a knife, but that occurred in August 2021 and would not have given her a basis for fear when they engaged in sexual intercourse earlier.

first, she said he put the condom back on and continued, but she later concluded she was confusing that incident with a later incident, and they did not continue having intercourse that day. Instead, she said, "I got upset, and I left."

Doe said she believed she was pregnant after the second incident, and she missed a period in April or May 2021. Doe told Torres when she missed her period, and he told her they could get a test and research abortion options. A pregnancy test came back positive. Doe said she had not had sexual intercourse with anyone else, and it was impossible that anyone else was the father.

Despite the pregnancy, Torres wanted to continue having sex with Doe. Doe testified they had sexual intercourse during the pregnancy at least eight more times, though she told a forensic interviewer during the investigation that it happened only three times. She said she understated the frequency because she was afraid of what would happen to Torres.

Doe said Torres gave her methamphetamine before, during, and after sex. After the first two times, Doe said she did not always say no expressly, "but it was the same type of situation where he would get frustrated. He threw a whole fit. And then eventually, he would ask me again until I would say yes, or I would give in, I mean." She clarified that "I didn't say yes. I would be, 'Okay. Go, go ahead. Fine.' " Doe testified that she did not like the penetrative sex but did like when Torres performed oral sex on her. She explained "I did like it, but it was just because . . . what do you expect? You're being touched down there. But I didn't like, necessarily want it" and never asked for it.

10

She testified about another occasion, when Doe's grandparents came home unexpectedly and interrupted a sexual encounter by asking Doe to help bring items into the house. Doe said she had been refusing to have sex with Torres, but he was persistent and eventually offered to pay her $95. She said she acquiesced because he already did it so much and "at this point, it doesn't matter." However, he paid her only $40 because he "didn't finish" due to the interruption. Instead, he made her return later. Doe used the money to buy marijuana. She used methamphetamine only when Torres gave it to her. When she was on methamphetamine, she said she "couldn't really think straight" and she didn't "really care at that point."

Doe kept returning to the tent because Torres would yell for her until she came. She eventually stopped expressly refusing sex because it was the only way Torres would spend time with her. Doe would ask, "Why can't we just have a regular day where you don't have to do this stuff?" But she said Torres would become aggressive. When Doe wanted to see her girlfriend, he would say the girlfriend was probably cheating on her and she should also cheat. Doe said she felt pressured to keep having sex and to "keep up with the lie." She was afraid someone would kill Torres in prison if she told anyone what happened.

Doe developed serious morning sickness, and Aurora took her to the doctor several times, though no one could figure out the cause. Eventually, Aurora saw Doe's stomach had expanded and confronted her over the pregnancy. At first, Doe refused to say who the father was because she was afraid she would be angry. When Aurora asked

Doe if Torres was the father, Doe became very quiet. Doe hugged Aurora, and Aurora started screaming. She asked again whether Torres was the father, and Doe admitted he was. Aurora screamed, "Oh, no, not my son." Arturo then confronted Torres, but he denied being the father.

Doe and Aurora filed a police report in October 2021. Doe went to a children's health center for an examination, then to Loma Linda Medical Center. An obstetrician at Loma Linda University Hospital performed an ultrasound that revealed Doe's fetus had multiple severe anomalies incompatible with life. Close genetic relationship between biological parents increases the risk of such genetic anomalies. After an ethics consultation, doctors recommended terminating the pregnancy because it was likely the fetus would not survive after childbirth. Doe underwent a medical procedure under general anesthesia to terminate the pregnancy. Doe reported numbness in one of her lower extremities about two weeks after the procedure and experienced stabbing pain and was unable to walk for around six weeks afterward.

A registered nurse assisted in the medical procedure and collected blood samples from Doe and tissue samples from the fetus. A DNA analyst with the California Department of Justice received the samples from the fetus, a DNA sample from Doe, and a DNA sample from Torres. As the analyst explained, "Once you've developed a DNA profile for an individual, you can see two alleles, which are just genetic variants that you would get from either your mother or your father. And you have two at every location that we look at when we develop a DNA profile." Because they had DNA profiles from

the mother and the fetus, the analyst was "able to then see which alleles have to have come from the father." Torres's DNA profile did not exclude him as the father.

The analyst then "calculate[d] what the probability of seeing this DNA profile from the [fetus] would be if the suspect is the father versus what the probability of seeing that evidence would be if another random, unrelated individual was the father." The "likelihood ratio" based on allele frequencies in the Hispanic population showed it would be 2.6 billion times more likely to see the fetus's DNA profile if Torres was the father compared to an unrelated, randomly chosen person of Hispanic descent.[3] The analyst interpreted that ratio as providing "very strong support" that Torres was the father of the fetus.

On August 29, 2022, the Riverside County District Attorney's Office filed an information charging Torres with three counts of aggravated rape by force on a minor aged 14 years or older. (Pen. Code, §§ 261, subd. (a)(2) & 264, subd. (c)(2), unlabeled statutory citations refer to this code.) According to the information the first incident

_____

[3] A likelihood ratio is a measure of the frequency of the alleles in a population and should not be interpreted as an expression of the likelihood that Torres was or was not the father. (*McDaniel v. Brown* (2010) 558 U.S. 120, 128 ["[I]f a juror is told the probability a member of the general population would share the same DNA is 1 in 10,000 (random match probability), and he takes that to mean there is only a 1 in 10,000 chance that someone other than the defendant is the source of the DNA found at the crime scene (source probability), then he has succumbed to the prosecutor's fallacy"]; *see also* Norrgard, K. (2008) Forensics, DNA Fingerprinting, and CODIS *Nature Education* 1(1):35 ["It is important to understand that this number is the probability of seeing this DNA profile if the crime scene evidence did not come from the suspect but from some other person. To regard the number as the probability that the suspect is the source of the crime scene evidence is to commit the 'prosecutor's fallacy'"].)

13

(count 3) occurred between December 2020 and April 30, 2021, the second (count 1) occurred between May 1, 2021 and June 30, 2021, and the third (count 4) occurred between July 1, 2021 and October 17, 2021. The information alleged Torres personally inflicted great bodily injury on Doe (by impregnating her) while committing the second rape offense. (§§ 12022.8, 667.61, subd. (d)(6).)

The information also charged Torres with additional offenses related to the same three acts of sexual intercourse. It alleged he committed three counts of incest (§ 285). Count 6 corresponded to the chronologically first rape offense (count 3), count 7 corresponded to the second rape offense (count 1), and count 8 corresponded to the third rape offense (count 4). The information also charged one count of sexual intercourse with a minor more than three years younger (§ 261.5, subd. (c)) and alleged Torres personally inflicted great bodily injury in the commission of that offense (§§ 12022.7, subd. (a), 1192.7, subd. (c)(8)). This statutory rape offense (count 2) corresponds to the second rape (count 1) and incest (count 7) offense. The information also charged Torres with one count of showing harmful or obscene matter to a minor (§ 288.2, subd. (a)(2), count 5) and one count of furnishing cannabis to a minor aged 14 or older (Health & Saf. Code, § 11361, subd. (b), count 9).

The information alleged as aggravating factors that the victim was particularly vulnerable under California Rules of Court, rule 4.421(a)(3), that Torres was charged with more than one crime under California Rules of Court, rule 4.421(a)(7), that Torres took advantage of a position of trust and confidence under California Rules of Court, rule

4.421(a)(11), and that he had multiple prior convictions of numerous and increasing seriousness under California Rules of Court, rule 4.421(b)(2).

On March 3, 2023, a jury convicted Torres of all counts and found true all the allegations against him. On May 19, 2023, in bifurcated proceedings, Torres admitted three of the aggravating factors, and the prosecution dismissed the multiple prior conviction aggravating factor.

The trial court sentenced Torres to a term of life without the possibility of parole for rape of a minor over the age of 14 where the defendant inflicted great bodily harm on the victim while committing the rape (count 1). (§ 667.61, subd. (l).) The court also imposed consecutive, determinate midterm sentences of four years for furnishing cannabis to a minor 14 or older (count 9), two nine-year terms for separate incidents of forcible rape of a minor 14 or older (counts 3 and 4), and a one-third the midterm sentence of eight months for showing obscene materials to a minor (count 5). Torres's total aggregate sentence is 22 years 8 months followed by life without the possibility of parole.

The court imposed but stayed one-third the midterm sentences of eight months for each of the three incest offenses (counts 6, 7, and 8) corresponding to the rape offenses (counts 3, 1, and 4, respectively). The court imposed but stayed a midterm two-year sentence for the statutory rape conviction, corresponding to the second rape offense, and a three-year enhancement for inflicting great bodily injury in committing that offense.

15

## II

## ANALYSIS

A. *The Incest Convictions*

Torres argues we should overturn his convictions on three counts of incest because the only proper proof that he was Doe's biological father is genetic testing or evidence he was married to and cohabiting with Doe's biological mother at the time of Doe's conception.

He argues the trial court erred by failing to instruct the jury that if the prosecution "failed to prove that [Torres] is the biological father of [Jane Doe] through either of these methods, you must find that he is not the biological father of [Jane Doe] and you must find him not guilty of this charge." He also argues that without such evidence the convictions must be reversed because substantial evidence does not establish he was Doe's biological father. Both arguments fail because the law does not limit proof of biological fatherhood as Torres suggests.

### 1. *Instruction on incest*

The trial court instructed the jury that "[t]o prove that the defendant is guilty of [incest], the People must prove that: [¶] . . . [t]he defendant had sexual intercourse with another person," at the time "he was at least 14 years old," "the other person was at least 14 years old," and "[t]he defendant and the other person are related to each other as biological parent and child."

16

The instruction is a modified version of CALCRIM No. 1180, which directs the court to "insert description of relationship from Family Code section 2200." (CALCRIM No. 1180.) That section defines incestuous marriages as those "between parents and children, ancestors and descendants of every degree, and between siblings of the half as well as the whole blood, and between uncles or aunts and nieces or nephews." (Fam. Code, § 2200.) Thus, sexual intercourse between people having any of those relationships would constitute criminal incest. The trial court modified the instruction to include only the biological parent/child relationship relevant here.

Torres argues here, as he did at trial, that proof of incest should be limited to the kinds of proof identified as establishing a family relationship under the Family Code. He points to Family Code section 7555, which sets out the standard for finding a person to be a biological parent through genetic testing. "[A] person is identified under this part as a genetic parent of a child if genetic testing complies with this part and the results of the testing disclose both of the following: [¶] (1) The person has at least a 99 percent probability of parentage, using a prior probability of 0.50, as calculated by using the combined relationship index obtained in the testing. [and] [¶] (2) A combined relationship index of at least 100 to 1." (Fam. Code, § 7555.) He also points to Family Code section 7540, which establishes, with some exceptions not relevant here, "that the child of spouses who cohabited at the time of conception and birth is conclusively presumed to be a child of the marriage." (Fam. Code, § 7540.)

17

Torres relies on *People v. Russell* (1971) 22 Cal.App.3d 330 (*Russell*) as establishing that the conclusive presumption of parentage applies in criminal cases. And, though he does not refer to the provision, the Family Code says expressly that the genetic testing standard applies in criminal cases. (Fam. Code, § 7556 ["this part applies to criminal actions," subject to certain limitations].) Indeed, Family Code section 7556, subdivision (c) says "[t]he court may direct a verdict of acquittal if the person is found not to be a genetic parent pursuant to Section 7555."

Torres asked the trial court to instruct the jury that the prosecution was required to prove either (1) Torres was the genetic parent of Doe using the standard set out in Family Code section 7555 or (2) Torres and Doe's mother were married and cohabiting at the time Doe was conceived and that failing such proof "you must find [Torres] not guilty of this [incest] charge." The parties agree the prosecution did not attempt to establish the parent/child relationship by submitting genetic testing or proof of marriage and cohabitation at the time of conception. We review de novo the trial court's refusal to instruct the jury as Torres requested. (*People v. Scully* (2021) 11 Cal.5th 542, 592.)

The trial court did not err. The statutory and case authority Torres relies on establish that certain kinds of evidence are *sufficient* to establish a parent/child relationship in a criminal case, not what kinds of evidence are *necessary* to establish that relationship. In *Russell*, the defendant was convicted of incest for having sexual intercourse with his niece. He challenged the conviction on the ground that his niece's mother was his half sister not his full sister, and "uncles and nieces who engage in sexual

18

intercourse are not guilty of incest unless they are related by the full blood." (*Russell*, *supra*, 22 Cal.App.3d at p. 333.) There was conflicting evidence of whether the defendant's mother and father lived together when he was conceived, so the trial court instructed the jury to find the husband was the defendant's father "if you find that [the husband] and the defendant's mother . . . were living together at that time. . . . You must not consider or discuss, nor should it enter into your deliberations in any way, whether or not [the husband] and [mother] actually engaged in sexual relations with each other or with any other persons at that time. If you have a reasonable doubt that they were living together at the time of [defendant's] conception, then you are not bound to find that [the husband] is the father of defendant." (*Id.* at p. 334.)

*Russell* holds that the conclusive presumption of parentage applies in criminal cases and overcomes other evidence about the identity of the parent. But *Russell* does *not* hold that, absent evidence triggering the presumption, no other evidence of parentage may be considered. In other words, evidence of marriage and cohabitation is sufficient, but not necessary, to establish parentage. *Russell* therefore does not apply to a case like this where no evidence addressed the marital and cohabitation status of the parents at the time of conception. In such cases, other evidence may prove the parent/child relationship.

The same is true of the statutory provisions related to genetic testing for parentage. As we noted, section 7556 specifies that genetic testing evidence applies in criminal actions. However, the same provision says an order for genetic testing "shall be made only upon application of a party or on the court's initiative." (Fam. Code, § 7556, subd.

19

(a).) That means genetic testing evidence is not required. And while a genetic test showing a defendant was "found not to be a genetic parent" under the genetic testing standard in section 7555 may allow a directed verdict of acquittal, the statute directs that absent genetic testing evidence, "the case shall be submitted for determination upon all the evidence."[4] (Fam. Code, § 7556, subd. (c).) In other words, genetic testing may be sufficient to establish or disprove the existence of a parent/child relationship in an incest prosecution, but such evidence is not required. Once again, other relevant evidence may establish the parent/child relationship.

It follows that the trial court did not err by refusing Torres's proposed modification to the instruction on the crime of incest.

### 2. *Substantial evidence of incest*

Torres also argues the incest convictions were not based on substantial evidence. However, his position is a corollary of his argument about the jury instructions, because he argues the evidence was insubstantial only because there was no evidence of genetic testing or marital cohabitation. As we have established, such evidence is not required.

On a challenge to the sufficiency of the evidence, we review "the whole record to determine whether *any* rational trier of fact could have found the essential elements of the

---

**4** If a defendant is "*found not* to be a genetic parent," there would be a definitive genetic test result establishing there is no parental relationship. In contrast, if a defendant is "*not found* to be a genetic parent," there would be no definitive genetic test result, either because the test was inconclusive or there was no test.

crime . . . beyond a reasonable doubt," and ask whether that evidence is "reasonable, credible, and of solid value." (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

The evidence met that standard. The Court of Appeal has held testimony by the victim is sufficient to establish a parent/child relationship. (*People v. Herman* (1950) 97 Cal.App.2d 272, 273-274.) The court has also recognized as sufficient evidence that the defendant held the victim out as or acknowledged her as his daughter. (*People v. Roberts* (1947) 82 Cal.App.2d 654, 655-656.) Here, Doe testified Torres is her biological father and Aurora and Arturo, Torres's parents, are her biological grandparents. She also testified she felt disgust when they had sexual contact because he was her father. Torres's parents also testified that Torres was Doe's biological father, and they turned to him for help talking to her when she got into trouble at school for drug use because of that relationship. Doe also testified Torres acknowledged their relationship to her by questioning why she would not say, "I love you, Dad." He also told Doe he would be killed in prison if anyone found out about their sexual relationship, especially after she became pregnant. The genetic testing of the fetus corroborated the evidence. The fetus had severe anomalies that can be caused by the close genetic relationship between parents.

We conclude this evidence provided substantial support for the jury's guilty verdict on the incest convictions and therefore will affirm the convictions on those counts.

B. *Rape Convictions*

Torres faced three forcible rape charges under section 261, subdivision (a)(2). Forcible rape requires proof the defendant (1) engaged in the act of sexual intercourse with the alleged victim, (2) without her consent, and (3) did so "against [her] will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another." (§ 261, subd. (a)(2); see also CALCRIM No. 1000.) Torres faced greater sentencing exposure because Doe was a minor 14 years old or older, increasing the sentencing triad applicable to each count to imprisonment for 7, 9, or 11 years. (§ 264, subd. (c)(2).) Torres faced a sentence of life without the possibility of parole for inflicting great bodily injury on Doe by impregnating her during the commission of the second chronological rape offense (count 1). (§ 667.61 subd. (l); see also § 12022.8.)

"In the context of rape, 'against the victim's will' is synonymous with 'without the victim's consent.'" (*People v. Giardino* (2000) 82 Cal.App.4th 454, 460.) "In prosecutions under Section 261 . . . in which consent is at issue, 'consent' means positive cooperation in act or attitude pursuant to an exercise of free will. The person must act freely and voluntarily and have knowledge of the nature of the act or transaction involved." (§ 261.6, subd. (a).) "[E]vidence that the victim suggested, requested, or otherwise communicated to the defendant that the defendant use a condom or other birth control device, without additional evidence of consent, is not sufficient to constitute consent." (§ 261.7.) A woman who initially consents to intercourse may change her mind.

If the woman communicates her change of mind by words or acts which a reasonable person would understand as withdrawing consent, but the defendant nevertheless forcibly continues the act of intercourse, the act is committed without consent. (*In re John Z.* (2003) 29 Cal.4th 756, 760.)

There is no special amount of force required to prove forcible rape. The term force as used in the forcible rape statute has "a common usage meaning, rather than a specialized legal definition." (*People v. Griffin* (2004) 33 Cal.4th 1015, 1024 (*Griffin*).) "The question for the jury . . . was simply whether defendant used force to accomplish intercourse with [Doe] against her will, not whether the force he used overcame [her] physical strength or ability to resist him." (*Id.* at p. 1028.) The jury had to find beyond a reasonable doubt defendant used "enough physical force to overcome the other person's will." (CALCRIM Nos. 1015, 1045.) " 'Force' includes circumstances where the victim did not want to engage in the act and the evidence does not otherwise establish the victim's positive cooperation in act or attitude. [Citation.] It also includes the force used to accomplish "the penetration and the physical movement and positioning of [the victim's] body in accomplishing the act." (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1071.)

By contrast, the term "duress" *is* defined by statute. " 'Duress' means a direct or implied threat of force, violence, danger, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which otherwise would not have

23

been performed or acquiesce in an act to which one otherwise would not have submitted. The total circumstances, including the age of the victim, and the victim's relationship to the defendant, are factors to consider in appraising the existence of duress."[5] (§ 261, subd. (b)(1); see also *Griffin*, *supra*, 33 Cal.4th at p. 1023 [noting "the Legislature . . . saw fit to expressly and specifically define the terms 'menace' and 'duress' . . . [but] it has not seen fit to do the same for the term 'force' "].) "The fact that the victim testifies the defendant did not use force or threats does not preclude a finding of duress." (*People v. Thomas*, *supra*, 15 Cal.App.5th at p. 1072.)

Torres conceded in the trial court and concedes here that he engaged in three incidents of unlawful sexual intercourse with a minor—violations of section 261.5—but argues the evidence did not support a finding that Doe did not consent to sexual intercourse or that he accomplished sexual intercourse by duress or force.[6] Because the

---

[5] The statutory definition of "duress" has its origin in the ordinary meaning of the word "duress." In 1985, the Court of Appeal introduced the definition after consulting a dictionary to construe "duress" as it appears in section 288. (*People v. Pitmon* (1985) 170 Cal.App.3d 38, 50 (*Pitmon*).) In 1990, the Legislature incorporated the *Pitmon* definition into the forcible rape statute when it expanded the offense to include cases of sexual intercourse accomplished against a person's will by means of duress or menace. (Sen. Bill No. 2586, 1990 Cal. Legis. Service, ch. 630; cf. Assembly Bill No. 187, 1993 Cal. Legis. Serv., ch. 595 [removing threat of "hardship" from the statutory definition]; see also *People v. Leal* (2004) 33 Cal.4th 999, 1005 [recounting this history].)

[6] Rape may be proven by showing nonconsensual intercourse was accomplished by fear or menace, both statutorily defined terms. However, the prosecution expressly chose to proceed under force and duress theories on count 3 and under a duress theory on counts 1 and 4. We limit our discussion to those theories.

first incident charged as forcible rape involves substantially different circumstances, we will discuss it separately from the second and third incidents.[7]

We review the record for substantial evidence. We examine the entire record and draw all reasonable inferences in favor of the judgment to determine whether there is reasonable and credible evidence from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Jackson* (2014) 58 Cal.4th 724, 749.) It is not enough to justify reversal that the evidence might reasonably be reconciled with a contrary finding. (*Ibid.*) "All intendments are in favor of the judgment and a verdict will not be set aside unless the record clearly shows that there is not sufficient evidence based upon any hypothesis whatsoever. [Citation.] Defendant bears an 'enormous burden.' " (*People v. Thomas*, *supra*, at 15 Cal.App.5th at p. 1071.)

### 1. *The first incident of sexual intercourse (count 3)*

There is substantial evidence that Doe did not consent the first time Torres had sexual intercourse with her. To begin with, Doe had previously made clear she was a lesbian and had an aversion to sexual involvement with men in general. She had also told Torres repeatedly that she did not want to engage in sexual touching. On the day in question, Doe initially refused Torres's advances before eventually acquiescing.

The incident started with Torres giving Doe methamphetamine and she said she was high when these events occurred. When Torres first asked Doe for sex she refused. He asked "Why not?" and reassured her they were alone and nobody would know. She

_____

[7] The chronologically first incident was charged as count 3, the second was charged as count 1, and the third was charged as count four.

25

told him she did not want to get pregnant. He told her "once you feel it, it will feel good" and continued asking for sex and commenting that he was sexually frustrated with his partner. Torres then went back to watching a movie before reinitiating by trying to touch Doe's vagina again. He again asked for sexual intercourse, and she again refused. When he asked for a reason, she said she was refusing for the same reasons she had given him before. She also reiterated she did not want to have sex with him because she was not attracted to men and did not want a penis inside her.

Torres became frustrated and persisted until Doe finally said, "Okay, fine, go ahead," and told him to "[j]ust do what you have to do." She insisted that he wear a condom. Initially he asked to put his penis "on top" of her clitoris. After a few minutes, he asked if he could "go inside" her vagina. Doe resisted again and restated her reasons against having intercourse, but Torres persisted, reassured her that it would feel good, and she acquiesced. Doe testified she knew Torres would not stop asking because he was persistent, and if he did not get his way he would throw a "silent fit."

The jury could reasonably have found, based on this evidence alone, that Doe did not positively cooperate and her submission to sex was not free and voluntary consent. She testified she consistently refused Torres's sexual advances and, pushing back against his insistence, explained in detail her reasons for not wanting to engage in intercourse. She told the jury she gave in to his pressure campaign because he would not stop, and she was worried about their relationship, which she felt was threatened by his withdrawal when she refused him. No evidence indicated her positive cooperation. It is true that she

26

did not physically resist Torres when he initiated sexual intercourse and that she directed him to wear a condom. However, it is well established by statute and case law that, absent other evidence of consent, juries and reviewing courts may not base a finding of consent on lack of physical resistance or by requesting that a perpetrator wear a condom. (§ 261.7; *People v. Barnes* (1986) 42 Cal.3d 284, 303; see also CALCRIM No. 1000.) We conclude the evidence of lack of consent was not only substantial but overwhelming.

There is also substantial evidence that Doe objected to and tried to stop the intercourse while it was happening. Withdrawal of consent during intercourse nullifies any earlier consent. (*In re John Z.*, *supra*, 29 Cal.4th at p. 758.) Doe testified she felt pain after Torres penetrated her vagina. She said she struggled against him for that reason and resisted by using her hands to try to push him off her. Torres did not stop, but instead adjusted, applied more force, and continued. Doe said she gave up trying to push him away because she was too weak to get him to stop. Doe also clearly expressed that she did not want to continue when Torres told her not to be tense, responding "How can I not be tense? It hurts. And I don't want it." Torres responded, "You're just thinking too much about it. You'll be fine" and "continued until he finished." The jury could reasonably have found, based on this evidence, that Doe communicated her lack of consent while the intercourse was occurring and that a reasonable person in Torres's position would have understood she withdrew her consent. (*In re John Z.*, at p. 762.)

The same testimony supports the jury's finding that Torres accomplished the intercourse through force. As in *John Z.*, "the force defendant exerted in resisting [Doe's]

27

attempts to stop the act was clearly ample to satisfy section 261, subdivision (a)(2)." (*In re John Z.*, *supra*, 29 Cal.4th 756, 763; see also *In re Jose P.* (2005) 131 Cal.App.4th 110, 116 ["the force inherently involved in the penetration itself was sufficient"].) Here, Doe testified she tried to push Torres off her and end the intercourse when Torres had her hips pinned down with his hands and she was experiencing pain. Torres responded by adjusting and applying more force to continue the intercourse. Doe's testimony about that incident was sufficient to warrant a jury finding that Torres used force against Doe to accomplish their first act of sexual intercourse. (*People v. Young* (1987) 190 Cal.App.3d 248, 258 [holding it was sufficient to support forcible rape verdict that "some force was used by defendant in both the penetration and the physical movement and positioning of [the victim's] body in accomplishing the act"].)

We therefore conclude the jury's verdict on count three, that Torres committed forcible rape the first time he had sexual intercourse with Doe, was supported by substantial evidence.

2. *The second and third incidents of sexual intercourse (counts 1 and 4)*

Torres argues the prosecution failed to present sufficient evidence for the jury to find Doe lacked consent or acquiesced under duress during their second and third acts of sexual intercourse. We conclude the evidence was more than sufficient to show lack of consent, as the inception of these incidents largely repeated the inception of the first incident. Although a closer question, we conclude substantial evidence also supported a finding of duress.

28

Concerning consent, Doe testified she was again under the influence of marijuana and methamphetamine provided by Torres. The second incident began with Torres asking Doe to wear feminine clothing while he painted her toenails, by this point a familiar ritual. Doe said Torres moved her legs open, and Doe tried to close them. Torres responded to her resistance by withdrawing, an implicit threat to the relationship she *did* want from her father. After sulking for a while, Torres requested sex, and Doe told him she did not want to have sex because the last time hurt and she was worried about becoming pregnant. Torres responded by reassuring her that intercourse would feel better the more often they did it. Doe eventually said "okay, fine" but insisted Torres had to wear a condom. The script was similar during later incidents of sexual intercourse. Doe conceded she did not always say no expressly, but said the same scenario played out. Torres would get frustrated by her lack of cooperation, he would withdraw for a while, and then he would ask again until she gave in. On one occasion, after she was already pregnant, he offered to pay her as well.

In our view, as in the first incident, this evidence provided the jury a substantial basis for finding Doe did not consent to the intercourse because they could reasonably have found she did not positively cooperate, but instead submitted under pressure.

The question remains, however, whether she acquiesced due to force or duress. On these rape counts, the prosecution proceeded under a duress theory. Duress in the context of rape is "a direct or implied threat of force, violence, danger, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which otherwise

would not have been performed, or acquiesce in an act to which one otherwise would not have submitted." (§ 261, subd. (b)(1).) The statute directs the factfinder to consider "[t]he total circumstances, including the age of the victim, and the victim's relationship to the defendant . . . in appraising the existence of duress." (*Ibid.*) The factfinder should also consider threats to harm the victim, physically controlling the victim, and warning the victim that disclosing the misconduct could jeopardize the family or the perpetrator. (*People v. Senior* (1992) 3 Cal.App.4th 765, 775; *People v. Schulz* (1992) 2 Cal.App.4th 999, 1005 (*Schulz*).)

Multiple courts have recognized that "[t]he very nature of duress is psychological coercion." (*People v. Cochran* (2002) 103 Cal.App.4th 8, 15, disapproved of on another ground by *People v. Soto* (2011) 51 Cal. 4th 229; see also *People v. Veale* (2008) 160 Cal.App.4th 40, 48; *Schulz, supra*, 2 Cal.App.4th at p. 1005 ["duress involves psychological coercion"]; *People v. Superior Court (Kneip)* (1990) 219 Cal.App.3d 235.)**8** As the *Cochran* court explained "A threat to a child of adverse consequences, such as suggesting the child will be breaking up the family or marriage if she reports or fails to acquiesce in the molestation, may constitute a threat of retribution and may be sufficient to establish duress, particularly if the child is young and the defendant is her parent." (*Cochran*, at p. 15; *see also People v. Senior, supra*, 3 Cal.App.4th at p. 775.)

---

**8** These cases all involve convictions for child molestation rather than rape, but as we have seen, *ante* at pages 24 to 25 and footnote 5, the same definition of duress applies in both contexts.

Here, the prosecution argues Doe submitted to acts of sexual intercourse she did not want out of concern refusing his advances would cause Torres to act violently or deny her the parental affections she wanted from him. Though she denied being afraid of Torres during the first occasion of sexual intercourse, she testified he had exploded in anger and smashed her phone when she was being disciplined for misbehavior sometime after the first occasion of sexual intercourse. She said that experience affected her thinking when she submitted to sexual intercourse the second and third times. She explained she did not know if he would "completely lose it" if she refused him. She also repeatedly emphasized Torres's withdrawal (his "silent fits") whenever she refused him, indications that he was withdrawing the parental affection she testified that she wanted.

In the context of these rape convictions, the question is whether this evidence was sufficient to justify the jury's finding that Doe faced a threat that would coerce a reasonable person in her circumstances to acquiesce to his demands for sexual intercourse. We conclude the evidence on these two counts was sufficient to sustain the verdicts. To start, Doe testified that she was concerned about his aggression and prior outburst during the second and later incidents of sexual intercourse. She complained he yelled and spoke aggressively to her when he was trying to assert himself in his parental role, including the occasion when he grabbed and broke her phone. The jury was entitled to accept her testimony that she was concerned he could act the same way if she actively resisted his sexual advances.

31

Also important is the evidence of Torres's implicit threat that he would withdraw his parental affections if she did not give in to his advances. A jury could have heard Doe's testimony about Torres's "silent fits" and concluded these were nothing more than temporary attempts to manipulate Doe. But the jury could also have concluded Torres was implicitly communicating to Doe something more—that refusing his advances would threaten her hopes for the parental relationship and the parental affections she craved. She testified she believed that allowing sexual contact was the only way Torres would spend time with her and complained to him that they never spent time together without sexual conduct. A jury could reasonably have concluded that Doe felt refusing Torres presented an existential threat to their parent/child relationship and submitted for that reason. On substantial evidence review, we give force to all reasonable findings and inferences in support of the judgment, so we credit that inference.

It is true some factors distinguish this case from the typical duress case involving abused children. The most important difference is that the other cases involve much younger children. In *Cochran*, the child was nine years old. (*Cochran, supra*, 103 Cal. App.4th at p. 15.) In *Schulz*, the child was of elementary school age. (*Schulz, supra*, 2 Cal.App.4th at pp. 1002-1004.) In *Pitmon*, the child was eight years old. (*Pitmon, supra*, 170 Cal.App.3d at p. 50.) The statute directs the factfinder to consider the age of the victim in deciding whether they acted under duress, and it is evident it would take less to psychologically coerce an elementary school student than it would to coerce a high school student. But a 16- or 17-year old is still a minor and still vulnerable to

manipulation and coercion by adults and parental figures. We conclude, even though Doe was nearing adulthood and was more mature than the typical victim found in the case law, there was substantial evidence to support the jury's finding that she acted under duress.

This case presents a more sophisticated scheme to coerce the teenage Doe than the typical duress case. Doe and her adoptive parents testified that she had trouble at school due to marijuana use. Aurora asked her son to step in and give Doe advice—to occupy a parental role. Doe was vulnerable and in need of parental guidance, and Doe herself testified she wanted a parent/child relationship with Torres. Torres responded by waiting until the adoptive parents were away and then asking if she smoked marijuana. When she said yes, he offered her a pipe, but instead of marijuana, the pipe contained methamphetamine. This was Doe's introduction to that extremely addictive drug, and Torres then became her supplier. That relationship, the jury could reasonably infer, allowed Torres to isolate her, make her dependent on him, and facilitate his advances. (See *Cochran*, *supra*, 103 Cal.App.4th at p. 15 ["attempt to isolate the victim and increase or maintain her vulnerability to his assaults" supports finding of duress].)

That is precisely what happened. Torres began inviting Doe to visit with him in the back yard. He convinced her that she needed to keep her visits secret, induced her to climb into his sleeping bag with him to remain unseen, and there regularly smoked methamphetamine with her. Once she was drawn in, he began slowly introducing sexuality, touching her buttocks, discussing sexual topics, sharing pornography, and

touching her vagina. After a few weeks of slow escalation, he put up a tent, which further isolated Doe and provided cover for him to escalate even more. Under that additional cover, Torres convinced her to change into feminine clothes, allow him to paint her toenails and increase his sexual touching, and eventually to introduce sexual intercourse.

According to Doe, at each step along the way, she resisted, but Torres employed the familiar tactics of abusers who use duress rather than force. He told her he would go to prison and be killed if she told anyone what was happening between them. He repeatedly withdrew his affections and threatened the loss of the parent/child relationship she wanted. He also increased her isolation and, by supplying drugs, increased her dependence on him. Eventually, she said she came to fear he could become physically aggressive or violent if she forcefully resisted his advances after he displayed aggression and violence when she resisted his authority to discipline her for going out with her friends without permission.

Given the considerable evidence of Torres's attempts to psychologically coerce Doe into sexual intercourse—to groom her as his victim—we conclude the jury had substantial evidence from which to conclude Torres's conduct introduced threats sufficient to coerce a reasonable person of ordinary susceptibilities and Doe's age to submit to sexual intercourse. We therefore affirm the forcible rape convictions on counts 1 and 4.

C. *Constitutionality of the Sentence*

Torres argues his sentence, 22 years 8 months followed by a consecutive sentence of life without the possibility of parole, is cruel and unusual under the United States Constitution, because it will require him to serve a term longer than his remaining life span.

Both the United States Constitution and the California Constitution prohibit imposing cruel or unusual punishment. (U.S. Const., 8th Amend.; Cal. Const., art. I, § 17.) However, Torres raises his claim under the federal constitution alone, and he does not argue that his sentence is disproportionate to the sentences imposed in California for other crimes or in other jurisdictions for the same crimes. Successful challenges under the Eighth Amendment are extremely rare. (*People v. Weddle* (1991) 1 Cal.App.4th 1190, 1196.) Unless a defendant's sentence is grossly disproportionate, the courts will not find an Eighth Amendment violation. (*Ewing v. California* (2003) 538 U.S. 11.) We review Torres's claim de novo. (*Vo v. City of Garden Grove* (2004) 115 Cal.App.4th 425, 433.)

Torres relies primarily on *Coker v. Georgia* (1977) 433 U.S. 584, 592. However, *Coker* is a death penalty case and is therefore not apposite. Torres's real complaint is he will not be able to complete his sentence during his natural lifetime. To support finding such a sentence cruel and unusual, he refers us to the concurring opinion of Justice Mosk in *People v. Deloza* (1998) 18 Cal.4th 585, 600-601 (*Deloza*). There, the trial court had sentenced the defendant to 111 years in prison, and Justice Mosk argued the length of the sentence alone made it cruel and unusual. "A sentence of 111 years in

35

prison is impossible for a human being to serve, and therefore violates both the cruel and unusual punishments clause of the Eighth Amendment to the United States Constitution and the cruel or unusual punishment clause of article I, section 17 of the California Constitution." (*Ibid.*)

As Torres contends here, Justice Mosk argued, "A grossly excessive sentence can serve no rational legislative purpose, under either a retributive or a utilitarian theory of punishment. It is gratuitously extreme and demeans the government inflicting it as well as the individual on whom it is inflicted. Such a sentence makes no measurable contribution to acceptable goals of punishment." (*Deloza*, *supra*, 18 Cal.4th at pp. 601-602 (conc. opn. of Mosk, J.).)

Justice Mosk's reservations have no application here. His target was not life sentences in general, but "century-plus sentences" that vastly exceed the human lifespan. (*Deloza*, *supra*, 18 Cal.4th at p. 602 (conc. opn. of Mosk, J.).) For defendants, like Torres, "convicted of numerous counts," Justice Mosk concluded, "[t]he maximum sentence that should be imposed is one a defendant is able to serve: life imprisonment." (*Ibid.*) That is precisely the kind of sentence Torres received for multiple counts of incest and rape. California courts have consistently upheld sentences that exceed a defendant's life expectancy. (See, e.g., *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1230-1231 [upholding sentence of 135 years to life].) Torres's sentence of 22 years 8 months plus life without parole is simply a life sentence and is short compared to the sentences in the cases Justice Mosk decried.

Here, though the sentence is severe, so too is the gravity of the offense. Torres raped his 16- to 17-year old daughter several times over several months, using drugs and threats to their parent/child relationship to induce her. In the end, he impregnated his daughter with a nonviable fetus and caused her to have a medically difficult abortion. His conduct was reprehensible and leads us to conclude the comparison between the crime and the sentence does not give rise " 'to an inference of gross disproportionality.' " (*Graham v. Florida* (2010) 560 U.S. 48, 60) As a result, Torres's federal claim fails at the threshold stage. We need not engage in a comparative analysis. In any event, Torres has identified no basis for thinking his punishment is disproportionate to the punishments assigned to other crimes in California or to the same crimes in other jurisdictions. Torres's sentence is not cruel and unusual punishment.

### III

### DISPOSITION

We affirm the judgment.

CERTIFIED FOR PUBLICATION

RAPHAEL
J.

We concur:

RAMIREZ
P. J.

MILLER
J.

37